**The PEOPLE of the State of Colorado, Complainant,**

v.

**Edward E. DIXON, Attorney-Respondent.**

**No. 80SA426.**

Supreme Court of Colorado.

Jan. 5, 1981.

Laird T. Milburn, Sp. Pros., Grand Junction, Robert B. Kane, Disciplinary Pros., Denver, for complainant.

No appearance for attorney-respondent.

DUBOFSKY, Justice.

This proceeding is the result of two consolidated cases heard by the Supreme Court Grievance Committee. Both involved the Respondent, Edward E. Dixon, who was admitted to the practice of law in Colorado on September 16, 1963. The Respondent answered the complaints in both cases, but did not appear in person or by counsel at the hearing. The Grievance Committee, based upon clear and convincing evidence at the hearing, found that the Respondent had violated a number of disciplinary rules and recommended an indefinite suspension. We accept the Grievance Committee's recommendation and suspend the Respondent indefinitely from the practice of law.

In three separate counts in the first case, the Respondent was charged with conduct involving dishonesty, fraud, deceit or misrepresentation; conflict of interest; and the unauthorized practice of law. The charges arose from the Respondent's representation of Larry Zinn (Zinn) and a corporation, Interiors for Living, Inc. (Interiors), formed by three persons, including Zinn and the Respondent.

After the corporation was formed in December, 1976, the Respondent served as a director, secretary-treasurer, and attorney, with the authority to sign checks drawn on the corporate account. In early 1977, Zinn requested the Respondent, as corporate attorney, to collect several accounts, including amounts owed to Interiors by Richard Yelick (the Yelick account) and by Donna Mari (the Mari account). On July 15, 1977, Zinn terminated the Respondent's responsibilities as collection attorney because of his failure to collect the accounts. On July 20, 1977, the Respondent resigned as an officer and director of Interiors. After July 20, 1977, the Respondent accepted and negotiated, on behalf of Interiors, a check in settlement of the Yelick account. Approximately one month later, Zinn learned from others that the Respondent had settled the Yelick account, and at the Grievance Committee hearing, testified that he would have rejected the settlement had he been told of it.

In October, 1977, the Respondent filed suit against Interiors, on behalf of Mari, whose claim against the corporation had arisen during April and May, 1977, while the Respondent was still an officer of and corporate attorney for Interiors. The Mari account was one of those assigned to the Respondent for collection. The Respondent obtained a default judgment for $3,087.60 on behalf of Mari against Interiors.

The Respondent also agreed to defend Zinn on a fish and game violation in Utah, although the Respondent is not admitted to

practice in Utah. The Respondent led Zinn to believe that he had obtained a continuance of the Utah trial, but when the Respondent and Zinn drove to Panguitch, Utah for the purported trial, they discovered that Zinn's $100 bail had been forfeited.

The second of the consolidated cases involved the Respondent's failure to adequately prepare for and competently conduct a trial in a child custody case, and, thereafter, to perfect the appeal which he agreed to undertake.

The Respondent's client, Kathleen Kramer, sought custody of her eight year old son, Gregory Kramer, who had lived with his father, Stephen Kramer, until the father's death in an automobile accident in December, 1976. Temporary custody of the boy was with his paternal grandfather, and physical custody was with a paternal aunt and uncle. Kathleen Kramer, through another attorney, had filed a motion for change of custody when she hired the Respondent in July, 1977. After the original meeting with the Respondent, Kathleen Kramer returned to her home in Georgia.

The trial court ordered an evaluation of Kathleen Kramer, her new husband, and the paternal relatives to be made by a team from Children's Hospital, Denver, Colorado. Arrangements were made to reimburse Kathleen Kramer and her second husband for any travel expenses incurred by them in attending the evaluation in Denver. The Respondent advised Kathleen Kramer that it was unnecessary for her to attend the scheduled evaluation interviews, and following his advice, she did not attend.

Kathleen Kramer made a number of efforts to reach the Respondent by telephone, and during one of the few occasions on which she spoke with the Respondent, he advised her to bring three character witnesses to the custody hearing. That advice was the extent of his trial preparation. The trial judge testified at the disciplinary hearing that the Respondent was two hours late to the hearing, that he had not substituted himself for counsel of record, that the Respondent appeared to be intoxicated or impaired in some fashion, that he presented no evidence of Kathleen Kramer's fitness to have custody of Gregory other than three character witnesses, that the Respondent seriously prejudiced his client's case by advising her not to participate in the Children's Hospital evaluation, and that the Respondent's final argument was based on assumptions for which there was no evidence. Testimony by Kathleen Kramer (by deposition) and her parents corroborated the trial judge's testimony.

After the trial court entered its order giving custody to the paternal relatives, Kathleen Kramer and her father instructed the Respondent to perfect an appeal. He promised to do so, but the time for appeal expired without appeal papers having been filed. Some time prior to June 11, 1979, custody of Gregory was voluntarily relinquished to Kathleen Kramer. This voluntary relinquishment was accomplished without the assistance of the Respondent.

The Grievance Committee found, by clear and convincing evidence, that the Respondent's conduct violated C.R.C.P. 241 and the following disciplinary rules: DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit or misrepresentation); DR 3–101 (unauthorized practice of law) and DR 6–101(A)(1) (failure to associate a lawyer who is competent to handle a legal matter); DR 5–101 (acceptance of employment when the attorney's interests impair his independent professional judgment) and DR 5–105 (acceptance of employment representing differing interests without the consent of the clients); DR 6–101(A)(2) (inadequate legal preparation); and DR 7–106(A) (advice to a client to disregard the ruling of a tribunal made in the course of a proceeding).

The Respondent received a letter of admonition dated February 9, 1979, for misrepresentations he made to a client about his alleged progress and success in a collection case. On September 8, 1980, we ordered that the Respondent be indefinitely suspended from the practice of law as a result of a Grievance Committee finding that the Respondent failed to pursue a case he had filed on behalf of a client. *People v. Dixon*, Colo., 616 P.2d 103 (1980).

The Grievance Committee here recommended that the Respondent be suspended indefinitely from the practice of law; [1] that he take the required action after suspension prescribed by C.R.C.P. 255; that reinstatement not be granted until the Respondent shows by clear and convincing evidence his rehabilitation, compliance with all applicable disciplinary or disability orders and rules, fitness to practice and competence; and that the Respondent pay the costs of the disciplinary proceeding. [2] We accept the Committee's recommendations.

A license to practice law assures the public that the lawyer who holds the license will perform basic legal tasks honestly and without undue delay, in accordance with the highest standards of professional conduct. In addition, the public has a right to expect that one who engages in professional misconduct will be disciplined appropriately. *People v. Meldahl,* Colo., 615 P.2d 29 (1980).

Accordingly, it is ordered that the Respondent, Edward E. Dixon, be suspended indefinitely from the practice of law. Because of the consistent pattern of the Respondent's breaches of his duties to clients, the Respondent may not apply for reinstatement for a period of at least eight years from the date of this opinion. Under the circumstances of this case, the Respondent's suspension is tantamount to disbarment, *People v. Pacheco,* Colo., 608 P.2d 333 (1979), and he will not be reinstated until he demonstrates his eligibility for reinstatement under C.R.C.P. 253. As a condition to reinstatement the Respondent shall be required to demonstrate his competence to practice law by again taking and passing the Colorado bar examination. *See People v. Davis,* Colo., 620 P.2d 725 (1980); *People v. Kluver,* Colo., 611 P.2d 971 (1980). In addition, the Respondent shall take the required action after suspension prescribed by C.R.C.P. 255 and pay the costs of $1,660.53 incurred in the disciplinary proceedings to the Clerk of this Court within sixty days.

1. The Grievance Committee apparently recommends an indefinite suspension because of the failure of the Respondent to participate in the grievance hearing and the consequent lack of evidence of mitigating circumstances.

2. The Respondent filed answers to the complaints in both cases in June of 1979. Thereafter, he disappeared and did not personally, or through counsel, participate in the hearing. However, on October 6, 1980, he accepted the findings, conclusions and recommendations of the Grievance Committee which were sent to him at a Nevada address by certified mail.